UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————— )
UNITED STATES OF AMERICA,  )
                           )
     Plaintiff,            )
                           )
       v.                )    1: 19 Cr. 00042 (KMK)
                           )
ANTHONY MARRACCINI,        )
                           )
     Defendant.            )
———————————————— )

## SENTENCING MEMORANDUM
## ON BEHALF OF
## DEFENDANT ANTHONY MARRACCINI

THE QUINN LAW FIRM, PLLC
Andrew C. Quinn, Esq.
399 Knollwood Road, Suite 220
White Plains, NY  10603

CALHOUN & LAWRENCE, LLP
Kerry A. Lawrence, Esq.
81 Main Street, Suite 450
White Plains, New York 10601

ANTHONY J. MARRACCINI, by and through counsel, Andrew C. Quinn, Esq. and Kerry A. Lawrence, Esq. respectfully submits this Sentencing Memorandum.  Mr. Marraccini is scheduled to be sentenced on May 16, 2019 in connection with his guilty plea to one count of tax evasion.

1. **Introduction:**

Anthony Marraccini is the revered former Chief of the Harrison Police Department who, over the course of his thirty-one (31) years in law enforcement, established an unparalleled reputation for hard work, compassion and discipline. Mr. Marraccini devoted virtually all of his waking hours (and many times his sleeping hours in his office) to ensuring the safety and security of the residents of his beloved childhood Town of Harrison, New York. To supplement his police income, he began a home construction and remodeling company, Coastal Construction, LLP, completing home renovation projects in and around Westchester County. While the quality of work he performed was exceptional, his control over his finances was not.  During the years 2011 through 2016 he failed to report all of his income on his tax returns.

Mr. Marraccini fully accepts his responsibility for his actions – as evidenced by his plea of guilty and his full payment of all outstanding state and federal taxes with interest - and is prepared to accept the punishment that this Court will impose. However, we respectfully request that the Court consider the extraordinary accomplishments Mr. Marraccini has achieved as a lifelong police officer, frequently to the detriment of his family. Mr. Marraccini took great pride in and was exceptionally committed to public service and in particular to his work in the Harrison Police Department.  He spent so much time working, he missed many milestones of his family's life, including birthdays, sporting events, school plays and other important functions.

Anthony Marraccini has a long and distinguished history of serving his community, enforcing the law, and pursuing justice for victims of crime. The support letters that accompany this Memorandum[1] provide abundant detail about Anthony's extraordinary generosity, compassion and commitment to members of his family and community. Anthony implemented programs to support Harrison's elderly and youth, combat drug addiction, and ensure the safety of the community's most vulnerable residents. He helped countless teenagers avoid or overcome substance abuse, enabling them to pursue higher education and successful careers. He mentored young police officers; indeed, while employed as a police officer, he suffered multiple on the job injuries, including significant injuries to his shoulders due to a collision while operating his RMP, aggravating injuries while attempting to place a resistant drug dealer in custody, and tinnitus from his K9 partner's regular barking, which has resulted in debilitating ringing in his ears which he suffers to this day. Yet his love for the job as police officer never faltered.

We have highlighted only a few of the many significant investigations that he initiated and supervised. For more than 30 years, Anthony has been available to his community around the clock.

Since 2011, Anthony has endured the serious illness and deaths of family members and friends, the loss of a job that he cherished, financial devastation, and the humiliation of an ongoing criminal investigation. This investigation has taken an extraordinary toll on his family – he and his wife are attempting to run his recently deceased brother in law's restaurant – a profession they

---

[1] As the Court will see, we have attached dozens of letters in support of Anthony Marraccini from family members, friends, loved ones, members of his community, and former police colleagues. As the Court will also notice, those letters are addressed to Ms. Genevieve Collins of the Tax Division of the Department of Justice. They were compiled during the investigative process which led to Mr. Marraccini's guilty plea. Following his plea of guilty, rather than ask each of these individuals to readdress their respective letters to the Court, we respectfully request that the Court accept these letters as though written for it. The letters convey the breadth and scope of love, respect and support Anthony enjoys from his community.

have absolutely no experience in - and Anthony's assistance is desperately needed to keep the restaurant afloat, securing the employment of over twenty employees.

Anthony has sold his home and relocated his family in order to pay the taxes he owed. His family and children have suffered public scorn (his young daughter has reported bullying incidents at school) as a result of the publicity surrounding this matter. The emotional and financial impact of the investigation over the past three years have been devastating. As indicated by the presentence report submitted by the US Department of Probation, Mr. Marraccini's risk to reoffend is considered low, and we believe, nonexistent. We believe a fair consideration of all of these factors compels the conclusion that a non-custodial sentence is sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

We urge this Court to consider Anthony Marraccini's many years of extraordinary public service, his devotion to his community, his family and his friends, as well as the impact a sentence of incarceration will have on his ability to care for and support his wife and five children. A non-custodial sentence will permit Mr. Marraccini to remain at home and provide for his devastated family, allow him to continue his good work in the community, and allow him to remain a loving husband to his wife Tabitha and caring father to his five children.

## 2. Procedural History and Facts:

Mr. Marraccini voluntarily surrendered to the United States Marshall for the Southern District of New York on January 23, 2019, following a lengthy investigation by federal authorities. He was arraigned on a felony information charging one count of Tax Evasion (26 U.S.C. §7201) and released on a Two Hundred Fifty Thousand Dollar ($250,000.00) unsecured appearance bond with the standard travel restrictions. On the same day, Mr. Marraccini entered a plea of guilty to

the sole count in the information before United States Magistrate Judge Judith C. McCarthy. On

February 4, 2019, the recommendation to accept the plea was accepted by this Court. Sentencing

is scheduled for May 16, 2019.

3. **Presentence Investigation Report**

The Presentence Investigation Report (hereinafter the "PSR"), prepared by the United

States Probation Office on July 22, 2016, calculated the advisory guideline level as follows:

| | | |
|---|---|---:|
| i. | USSG §§2T1.1(a)(1) and 22T4.1(h) because the tax loss was $902,037.80, the base level is twenty (20). | 20 |
| ii. | Specific Offense Characteristic | 0 |
| iii. | Victim Related Adjustment | 0 |
| iv. | Adjustment for Role | 0 |
| v. | Adjustment for Obstruction | 0 |
| vi. | Acceptance of Responsibility §§3E1.1(a) and (b) | -3 |
| vii. | Total Offense Level | **17** |

In accordance with the Federal Sentencing Guidelines, based upon a total offense level of

17 and a criminal history category of I, the guidelines range is 24 to 30 months.   We have agreed

with the Government that this is the applicable guideline offense level.

4. **Analytical Framework:**

As the Court is undoubtedly aware, on January 12, 2005 the United States Supreme Court

inexorably altered the doctrinal landscape of federal sentencing with its decisions in *United States*

*v. Booker,* 543 U.S. 220 (2005). The Court in *Booker* made it clear that United States District

Courts are no longer bound or restricted by a mandatory and unwavering application of the United

States Sentencing Guidelines.  The fading reliance on the Guidelines in favor of a more humanizing

process is a welcome re-embracement of fund

When sentencing a defendant, the court must consider the applicable Guidelines offense

level, which is advisory, and the factors enumerated in Title 18, United States Code, Section

3553(a).[2]  *United States v. Booker*, 543 U.S. 220 (2005); *United States v. Corsey*, 723 F.3d 366, 374 (2d Cir. 2013).  The sentence imposed must be "sufficient, but not greater than necessary" to comply with the purposes set forth in Section 3553(a)(2). 18 U.S.C. § 3553(a).  The "enhanced scope of a sentencing judge's discretion in the post-Booker world of advisory Guidelines" permits a sentencing court to consider:

> the judge's own sense of what is a fair and just sentence under all the circumstances. That is the historic role of sentencing judges, and it may continue to be exercised, subject to the reviewing court's ultimate authority to reject any sentence that exceeds the bounds of reasonableness.  *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

Therefore, while the court must consider the Section 3553(a) factors, it has discretion to impose a non-Guidelines sentence based on factors not specifically articulated in Section 3553(a), as long as the resulting sentence is reasonable. 18 U.S.C. § 3553(a)(1); *Gall v. United States*, 552 U.S. 38, 49-51 (2007).

Applying the the factors enumerated in Title 18, United States Code, Section 3553(a), it is apparent that a non-custodial sentence is "sufficient, but not greater than necessary" in this case.

---

[2] Section 3553(a) provides that when sentencing a defendant, the court must consider a number of factors:
(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
(2)  the need for the sentence imposed –
    (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B)  to afford adequate deterrence to criminal conduct;
    (C)  to protect the public from further crimes of the defendant; and
    (D)  to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner.
(3)  the kinds of sentences available;
(4)  the kind of sentence and the sentencing range established for --
    (A)  the applicable category of offense committed by the applicable category of the defendant as set forth in the Guidelines – (i) issued by the sentencing commission . . .;
(5)  any pertinent policy statement
    (A) issued by the sentencing commission . . .;
(6)  the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
(7)  the need to provide restitution to any victims of the offense.

the Court to consider the following factors and analysis and fashion an individualized sentence based upon the facts and circumstances of the instant case.

**5.  Offense Characteristics:**

Mr. Marraccini fully appreciates the seriousness of the crime for which he stands convicted – filing false tax returns, under-reporting his income, and failing to pay his full tax liability for the years 2011 through 2016. Mr. Marraccini has paid all back taxes, federal and state, as well as interest for these year.  In order to pay his back taxes, Mr. Marraccini sold his family home, relocated his wife and children, and borrowed money from family members.

**A.  Family and Personal History**

Anthony Marraccini has lived in Harrison, New York for his entire life.  He was born in 1964, youngest of five children.  From a young age, Anthony's parents taught him the importance of compassion and generosity for his friends, family, and community.  His mother, Nina Marraccini, warmly welcomed anyone who came to their home.  His father, Phillip Marraccini, was a respected physician and surgeon for the Harrison Police Department.  Dr. Marraccini was available at any time during the day or night for any patient who called.  Anthony recalls his father frequently leaving their home during the evening to check on patients.  This left a lasting impression on Anthony who, as a police officer, treated the members of his community like his father had treated patients – responding immediately to anyone who needed his help.

Anthony shares a strong bond with his siblings.  Commitment to public service clearly runs in the family.  Anthony's brother, Phil, is a former Harrison town supervisor (1994 - 1998) and an attorney.  Phil describes the values that his parents emphasized with their children:  "*Myself and my siblings were brought up with an emphasis on the importance of family, community and charity.  Four days before our father died in 2014, at age 94, he reinforced one of our family*

*values by reminding us to 'always be kind.' My brother Anthony shares and exemplifies a commitment to t hose values."* [P. Marraccini Ltr.].

Anthony's commitment to public service was inspired, in large part, by his father and brother Frank. He was also motivated by the complete loss of his home to a fire when he was about ten years old. At age 15, he became a junior volunteer firefighter. Within two years he rose to the rank of Captain. At the age of eighteen, he become a member of the Harrison Volunteer Fire Department where he served as an Engineer Driver, a Lieutenant, and a Captain for two terms. He became a founding member of the Harrison Volunteer Ambulance Corps, eventually becoming the First Vice-President of the ambulance corps. In that position, he was instrumental in ensuring that Town of Harrison was capable of providing ambulance service and medical assistance around the clock. He succeeded in this endeavor by working many of the night shifts himself.

Anthony's brother Frank was a member of the Harrison Police Department. When Frank applied to be a police officer, he convinced Anthony, then sixteen, to take the test with him. Anthony received the highest score that year and, along with his brother, became a police officer.

Anthony's sister Nina is also a public servant, working for the Town of Harrison directing the Town's community service division. That agency's programs include the Senior Safety Check, Senior Medical Transportation, Senior Taxi Vouchers, and the Harrison Food Pantry. Prior to that, she worked as a secretary at the police department.

Anthony's sister Maria is presently the CFO of Halycon Construction Corporation. Maria was a single parent who relied heavily on Anthony when her daughter was young. She writes that *"I would not have been able to raise my daughter [i]f it hadn't been for my brother. My daughter had her struggles throughout the years being an only child of divorced parents with an absent father. Not only was Anthony there for her to step in at 'Father/Daughter' school functions but*

*he helped me raise her with guidance, love and understanding and took on the father figure role that she was missing."* [M. Dioguardi Ltr.].

Anthony has been married to his wife Tabatha for 24 years.  They have five healthy children who are attending middle school, high school, and college.  Tabatha describes her husband as *"my rock, my love, and . . . the kind of man our children would and do admire and emulate." He was not "an ever-present dad," and he ultimately "missed many of our children's milestones because of his dedication to his job." Nevertheless, Tabatha appreciates that their children, from a young age "understood that their dad had a responsibility that was bigger than that to the six of us."* [T. Marraccini Ltr.].

As the years went by, and his family grew, Anthony sought to supplement his income by completing home improvement projects. The business, Coastal Construction, grew quickly: in retrospect, too quickly. Given the demands of the Harrison Police Department, his commitment to his community, and the failing health of his parents and two close friends, Anthony was not as focused as he could have been on his construction business. *One employee, Nazar Burak writes that he "barely saw [Anthony]. He used to come late nights or weekends only."* [N. Burak Ltr.].

Over the years, Anthony's business continued to grow, and he found juggling the responsibilities of running Coastal and his other responsibilities difficult *"especially since he never had any formal business training or background" and was juggling running a business with running the police department and taking care of family and friends".* [P. Marraccini Ltr.]. Since the age of 15, Anthony has been focused on his responsibilities as a public servant and the needs of his community and family.  He never received any training on managing a business, maintaining business records, or preparing tax returns.

**B.**     **Harrison Police Department: Support for Community**

Anthony attended 1 ½ semesters at Fordham University.  He was forced to stop school when he suffered an illness: he ultimately decided to forego college and, in 1984, became a police officer.  When he joined the Harrison Police Department in 1984, he was only 20 years old – the youngest police officer hired by the Town of Harrison.

Shortly after joining the police department, Anthony promoted the formation of a K-9 unit.  Anthony researched the requirements of a K-9 unit, found a dog, and then spent six weeks training the dog.  *"Anthony and his canine Benny made numerous arrests of wanted criminals and seized numerous amounts of narcotics, which would have otherwise made their way to the streets of Harrison and its surrounding communities."*  [R. DiBuono Ltr.].  As a young police officer, Anthony was committed to the aggressive investigation of criminal conduct.  His friend and fellow police officer Dominick Pascale writes that Anthony was always concerned that *"someone might need our help or there might be a bad guy out there.  We had to do our job the best we can at all times."*  [D. Pascale Ltr.].  *Other former colleagues write that Anthony had "a passion to help people, and to 'get the bad guy.'"  [L. Marshall Ltr.].  "His love for being a public servant was epic."  [F. Bisceglia Ltr.].  He "was well known for being the first one to the station in the morning and often the last one to leave at night."  [Rev. Monturo Ltr.].*

Throughout his career in the police department, Anthony created new programs to help members of the Harrison community.  He implemented programs to help the elderly population.  Under his supervision, the police department ran the "Senior Safety Check," in which officers would pay daily visits to the home of any senior who was living alone, ill, or disabled.  [N. Marraccini Ltr.]

Anthony was also very committed to those individuals in Harrison struggling with substance abuse. He initiated Operation HOPE to assist drug addicts and provided a much needed alternative to incarceration. [K. Wong Ltr.]. Harrison Central School District Superintendent Louis N. Wool writes about Anthony's intervention with and support for Harrison students who were involved with drugs:

> *Two instances stand out in my mind that [demonstrated] his humanity and personal connection to the people he served. In both of these instances, the chief worked long into the night, meeting with every child and every parent to explain the circumstances and offer a way forward. In one of these instances the child was involved in a serious drug incident, and rather than just let the system process the student, once again he met with the family to offer support and console them. [L. Wool Ltr.].*

Many individuals attribute their sobriety to Anthony's intervention and unwavering support during times of struggle with substance abuse:

- *"He helped me get treatment, and he's the reason I'm six years sober." [P. Chasin Ltr.];*

- *"One of our kids got involved with the wrong crowd in high school and like so many other kids became addicted to opioids . . . . Without Anthony's involvement our child would most probably not be alive today . . . . Our child has been sober for over 6 years, has graduated from college and is working as a productive member of society." [B. Ersoff Ltr];*

- *When dealing with a young man who struggled with addition, Anthony made sure that he was sent to a treatment center. "Mr. Marraccini stayed in contact with him and made sure to help him after he returned to the community." [L. Smith Ltr.];*

- *After threatening to commit suicide, "he kept me on the phone . . . I was going to jump. He sent cars to intercept me . . . He got me to stop drinking then. Now he's helping me again. He's still in contact with us." [E. Collins Ltr.].*

The letters which have been forwarded to you reveal that throughout his career Anthony was a dedicated and hardworking police officer, always available to respond to an emergency:

> *The Harrison Police Department under the direction of Anthony as Lieutenant, Captain and Chief was recognized by the highest levels of law-enforcement in this country. He*

*orchestrated joint task force with NYPD, FBI, DA's office, Westchester County Police and several other agencies and corporations. His collaboration with these agencies resulted in not only arrests, but convictions. The Harrison Police Department's reputation was outstanding throughout the country under Anthony's leadership. He sent officers to other states to assist in apprehending criminals. Again, this was all done while taking care of his family, ill parents and dying friends. [D. Pascale Ltr.].*

Anthony was never off duty. When a pair of distraught parents could not locate their son, Anthony remained with the parents while his police officers and other municipalities, at Anthony's request, searched for the young man. In one particularly noteworthy yet tragic case, Anthony remained with a local family whose son went missing for days; Anthony mobilized the Department to utilize every resource to find the boy. Sadly, their son was found under the worst possible circumstances: their son had committed suicide. Anthony insisted that he personally tell the family himself. [C. Mascali Ltr.]. On another occasion, while with friends at a local swim club, Anthony saw a 13 year-old having a seizure in the pool. Anthony dove in the pool and pulled the boy out. After he was out of the water, Anthony positioned him so that his airways remained clear until an ambulance arrived. [J. Ricciardi Ltr.].

### C. Harrison Police Department:  Noteworthy Investigations

Anthony's former colleagues write about his tireless and innovative efforts: *"We served alongside each other . . . we stood 'shoulder to shoulder' during many critical incidents, and while arresting numerous, dangerous and violent criminals." [V. Casetellano Ltr.]. Anthony was "a trailblazer," using advanced technology to solve crimes and "implement[ing] the latest technology for the Town of Harrison's Police vehicles which were years ahead of most other departments in safety features, computer, video, and lighting technology." [G. Gerstein Ltr.].*

When investigating a gang that engaged in home invasions and targeted the elderly, Anthony proposed an idea that was novel in 2004 - obtaining a warrant to extract data from cell phone towers to identify cell phones in use at the times of the robberies. Warrants were obtained

to retrieve the cell phone data.  Using this information, the police department obtained wiretaps and search warrants.  Members of this violent gang were successfully prosecuted by the Westchester County District Attorney's Office thanks to the innovative efforts initiated by Anthony Marraccini.  See *Gega v. Ercole*, 11 Civ. 7892-AT-KNF (SDNY June 24, 2013), available at https://www.leagle.com/decision/infdco20130625c00; Member of Albanian Home Invasion Burglary/Robbery Ring Sentenced, Westchester District Attorney's Office, http://www.westchesterda.net/pressreleases/0516albaniansentence.htm (last visited Sept. 6, 2018).  As a result of the ingenuity behind the use of cell phone tower data, Anthony and the Harrison Police Department pioneered this investigative technique which is now a staple of modern-day police investigations.

Another noteworthy investigation involved the successful prosecution of a foreign-based organization involved with fraudulently obtaining Ohio Driver's licenses.  Anthony persuaded an individual with knowledge of this criminal organization to cooperate with the FBI in Newark, New Jersey and Cleveland, Ohio.  (N. Burak ltr.).  This criminal organization was ultimately successfully prosecuted by the U.S. Attorney's Office in Cleveland.

The Harrison Police Department aggressively investigated dozens of cases involving fraud of the elderly: Anthony would authorize the issuance of an arrest warrant and would dispatch his detectives throughout the country in an effort to find and apprehend individuals who attempted phone scams against the elderly in Harrison, often sending his officers throughout the country on a moment's notice. His efforts resulted in dozens of arrests and saved elderly residents of the Town thousands of dollars.

The investigations noted above are only a fraction of the dozens of complex investigations overseen and successfully completed by Anthony Marraccini and the Harrison Police Department while he was Captain and then Chief of Police.

### D. **2011 – 2015: Harrison Police Department Responsibilities**

The demands of the Harrison Police Department were particularly demanding during the years 2011 through 2015. For four days after Hurricane Sandy, in 2012, Anthony never left the police station. The Town of Harrison was committed to opening every road in town within 48 hours of the storm. Anthony was a key player in these efforts, communicating directly with Con Edison to make sure that his community, particularly the elderly and infirm, had electricity.

In October 2012, Anthony supervised the investigation and arrests of a group of burglars responsible for 27 home invasions in New York and Connecticut. Between July 2011 and October 2012, Carmine Stanzione, Jason Foskey, and Daniel Dibiase stole jewelry, silverware, and other items with a value of more than $2.5 million. While Anthony was with his wife at an event during October 2012, he received a call that the crew was attempting to burglarize a home in Harrison. *As a result, Anthony "spent much of that night . . . talking on the phone, directing us to ensure our safety and a successful investigation." [K. Wong Ltr.].*

In 2013, Anthony led efforts to have a school resource officer available to high school students. Gina DiRusso, a former high school student who benefitted from this program writes:

> *He stationed one police officer in the high school to serve as a friendly-face, a mentor and an enforcer of the law. Mr. Marraccini and his force kept a close eye on the high school, and though there were few outbreaks or incidents among my peers, anything that came about was handled immediately and efficiently. . . . Though credit is due to the entire police force, Mr. Marraccini's diligence and dedication to the youth of our community was always evident as I walked down the halls of my high school every day in such a safe and supportive environment. [G. DiRusso Ltr.].*

In November 2014, Anthony, while Chief of Police, supervised a team of officers during the investigation and arrest of seven burglars who were responsible for more than 25 burglaries. The group, nicknamed the "cul-de-sac burglars," stole valuables worth hundreds of thousands of dollars from homes in in Westchester and Putnam Counties as well as Long Island, Connecticut, and New Jersey.  Anthony was noted by CBS local news as saying "the investigation took his people far from home."  Cops in Westchester County Help Bust Up Alleged Cul-De-Sac Burglary Ring, CBS New York (Nov. 13, 2014, 6:14 PM), https://newyork.cbslocal.com/2014/11/13/cops-bust-up-alleged-cul-de-sac-burglary-ring/.

In 2015, while serving as the Harrison Chief of Police, police officers were called to the home of retired Westchester police officer Glen Hochman.  Hochman had killed his two daughters, three dogs, and himself in the middle of the night.  In the aftermath of the murders and suicide, *"Anthony led the investigation, consoled the families, briefed the media, led the community with strength and served as a steady hand of guidance in uncertain times." [Rev. Monturo Ltr.].*

### E. 2011 - 2014:  Care for Elderly Parents

Between 2011 and 2014, Anthony's parents struggled with serious health issues.  In her letter, Anthony's sister describes the time and energy Anthony devoted to his ailing parents during this period.  He checked in on them regularly, helping with chores and household maintenance. *He "dedicated countless hours every week to their medical care, doctor's visits, hospitalizations, etc." [Rev. Monturo Ltr.].*

Anthony's mother, Nina Marraccini struggled with serious health issues for many years. Since the 1980s, she suffered from debilitating lung infections, shingles, fibromyalgia, and a broken hip.  Her health seriously deteriorated between 2010 and 2012.  During those years, Mrs.

Marraccini was constantly in and out of the hospital, requiring even more of Anthony's time and attention. She passed away on February 29, 2012 at the age of 86.

After Mrs. Marraccini passed away, Phillip Marraccini, began to fail and became increasingly dependent upon Anthony. Anthony provided emotional and financial support for his father, visiting him for breakfast and dinner every day for two years. [P. Marraccini Ltr.]. Anthony continued this habit for two years after his mother died. Dr. Marraccini passed away in April 2014.

### F. 2011 – 2014: Joey Acocella and Ralph Attilio

Anthony first met his good friend, Joey Acocella, while Joey was employed as a data entry clerk in the police department. Joey had severe physical disabilities. He was born with *lumbar sacral agenesis*, a congenital disorder which causes abnormal fetal development of the lower spine. At the age of three, Joey's legs were amputated, forcing him to spend the rest of his life in a wheel chair. He underwent a kidney transplant while in high school. Anthony mentored Joey while he worked in the police department and the two became close friends.

Joey had a passion for local politics and, with Anthony's encouragement, he ran for the Harrison Board of Education and later for town clerk.

While serving as town clerk, during 2009, Joey became very ill and required a second kidney transplant. Anthony visited Joey frequently while he was in the hospital, spending time with his friend who slipped in and out of consciousness. Joey never received that transplant and passed away on August 8, 2011 at the age of 30. See Zach Oliva, Harrison Town Clerk Joseph Acocella Dies, Harrison Patch (Aug. 8, 2011, 11:58 PM), https://patch.com/new-york/harrison/harrison-town-clerk-joseph-acocella-dies.

Following Joey Acocella's passing, a second friend became gravely ill. During 2012 and 2013, Ralph Attilio struggled with testicular and liver cancer. As Ralph's widow writes of Anthony's unwavering support during this difficult period of time:

> *I truly don't know what we would have done without Anthony by our side while my husband was battling incurable cancer. Anthony was the one who found Ralph's doctors, was at every single appointment and every single procedure. He would take an hour off from work to be with us and then go right back to Police Headquarters where he would complete his 10-12-hour work day. [M. Attilio Ltr.].*

After Ralph passed away, Anthony continued to support the Attilio family, serving as father figure for Ralph's daughters. Anthony attended graduations, celebrated new jobs, and spoke to the daughters on a regular basis. *The girls "have a second father figure in their life that will always support them as if he was their real father." [Id.].*

### G. Robert Luiso

In April 2018, Tabatha's Marraccini's brother, Robert Luiso passed away suddenly at the age of 47. Robert's passing was exceptionally painful for the Marraccini family. Robert was frequently at the Marraccini home, spending time with the children. *Robert owned a restaurant in Port Chester, which Anthony and Tabatha have since taken over "so it won't fail to keep [Robbie's] legacy alive." [M. Selden Ltr.].* Anthony and Tabatha have no prior experience running a restaurant and are struggling to keep the restaurant open. The restaurant employs about 20 individuals who depend on the business for their income.

### 6. Sentencing Considerations

As a result of *Booker* and its progeny, no longer are courts *required* to impose a sentence "within the range" as provided for in the United States Sentencing Guidelines and as previously required by 18 U.S.C. §3553(b)(1). In addition to the Guidelines, which are now advisory, courts

must take into consideration the sentencing factors detailed in 18 U.S.C. §3553 when making a

sentencing decision.

**A.      18 U.S.C. § 3553**

Title 18 U. S. C. A. §3553(a) provides:

> Factors to be considered in imposing a sentence. The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> > (B) to afford adequate deterrence to criminal conduct;
>
> > (C) to protect the public from further crimes of the defendant;
>
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for—
>
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—
>
> (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense."

Mr. Marraccini's extraordinary background of public service and charitable actions, his current family needs, and the certainty of rehabilitation, support Mr. Marraccini's requested sentence. Departures from the Sentencing Guidelines are further justified by instances where the defendant has young dependents. *See United States v. Johnson,* 964 F.2d 124 (2d Cir. 1992).

## B. History and Character of the Defendant

As stated *supra* and evidenced by his lifetime of public service, Mr. Marraccini has been devoted to his community and to his family. In the short time since his guilty plea, Mr. Marraccini has had ample time for the kind of reflection and introspection that only those who face the prospect of losing all that is dear to them can experience. This self-evaluation is critical in that it serves as indicia of the type of citizen that Mr. Marraccini will be if afforded the great privilege and opportunity of remaining with his wife and children.

Mr. Marraccini took a great deal of pride in all that he accomplished during his 31 years on the police department – he honestly felt it was his purpose in life – initiating innovative investigative strategies, policies designed to assist individuals who suffered from drug addiction, and help for anyone who needed his assistance. He believed that he was following in his family's tradition of service to the community. It has been humiliating for Mr. Marraccini to see all of his good work eclipsed, approximately three years ago, when newspapers began to report that he was under investigation. For close to three years, he has labored under the cloud of the investigation. This particular punishment will last a lifetime; he will never recover from the publicity surrounding this investigation.

Even more painful, Mr. Marraccini has been forced to watch the impact that this investigation has had on his wife and children. Watching his wife and children suffer as the reports of the investigation were published has been unbearable for him.

Following the untimely passing of his brother-in-law, Mr. Marraccini has been committed to keeping Robert Luiso's Port Chester restaurant open.   As a result of Mr. and Mrs. Marraccini's commitment of considerable time and effort, the restaurant has remained open and continues to support more than twenty employees.   If Mr. Marraccini is unable to help his wife run this restaurant for any length of time, the future of the restaurant and its employees will be in jeopardy

It is beyond dispute that Mr. Marraccini has been an exceptional public servant, family man and friend. The individuals who have written on Mr. Marraccini's behalf demonstrate and extraordinary commitment to his community and to his family. This is only a fraction of the hundreds of people he has helped.   We ask the Court to carefully consider his character and background when determining the appropriate sentence.

We recognize that it is Mr. Marraccini's actions that caused these collateral consequences. We respectfully request that the Court to consider the impact that this investigation has had and will continue to have on Mr. Marraccini, his family, and individuals in the community who depended on him.


## CONCLUSION

For all of these reasons stated, we respectfully request that the Court sentence Anthony Marraccini to sentence that does not include incarceration, and allow him to continue to return to his life as a father, husband and law-abiding citizen.

Dated: May 3, 2019
White Plains, New York

Respectfully submitted,


THE QUINN LAW FIRM, PLLC
Andrew C. Quinn, Esq.
399 Knollwood Road, Suite 220
White Plains, NY  10603


CALHOUN & LAWRENCE, LLP
Kerry A. Lawrence, Esq.
81 Main Street, Suite 450
White Plains, New York 10601


To: AUSA James McMahon (via ECF)